## U.S. DEPARTMENT OF AGRICULTURE
## FARM SERVICE AGENCY

### BEFORE THE
### DEPUTY ADMINISTRATOR FOR FIELD OPERATIONS

---

Appeal of
PAULA PUCKETT

---

## MEMORANDUM OF FINDINGS AND ANALYSIS

The matter for review is the appeal of Paula Puckett ("Puckett"). Puckett has appealed to the Deputy Administrator for Field Operations ("DAFO") disputing her removal from her position as a Program Technician (PT) in the Farm Service Agency (FSA) Jackson County Office in Altus, Oklahoma.

By letter dated July 31, 2012, Carl Josefy ("Josefy"), the County Executive Director for the Jackson County Office and Puckett's first-line supervisor, issued a proposed disciplinary action of a 5 calendar day suspension from duty without pay to Puckett. The proposed suspension was based on discourteous conduct in the workplace and being absent without leave (AWOL). Agency File, Tab 14. Puckett did not submit a written or oral reply. On August 5, 2012, a decision letter sustaining the proposed 5-day suspension was provided to Puckett. Agency File, Tab 13.

On November 1, 2012, a notice of proposed disciplinary action of a 14-day suspension was provided to Puckett. The reason for the proposed suspension was excessive, repeated tardiness. There were 20 listed specifications. Agency File, Tab 11. On November 7, 2012, Puckett and her husband Jim met with Jackson County Committee ("County Committee") chair David Bush about the 14-day proposed suspension. Agency File, Tab 10. In a letter dated November 15, 2012, the County Committee suspended Puckett from duty and pay for 14 days from November 18, 2012 through December 1, 2012. Agency File, Tab 8.

On March 29, 2013, Josefy provided Puckett with a notice of proposed removal letter. The reason for the proposed removal was excessive, repeated tardiness. 22 specifications were listed in the letter. Agency File, Tab 6. Puckett met with the County Committee on April 12, 2013 and gave an oral reply. The County Committee subsequently notified Puckett by letter hand-dated May 1, 2013, that it had decided to remove her from service effective immediately. Agency File, Tab 4. Puckett appealed her removal to the Oklahoma State Committee ("State Committee") in writing on May 1, 2013. Agency File, Tab 3. She also met with the State Committee to present her appeal orally on May 20, 2013. By letter dated June 3, 2013, the State Committee affirmed the removal action. Agency File, Tab 1.

This memorandum of findings and analysis is submitted pursuant to the procedures and regulations applicable to a removal for conduct, as set forth in 7 C.F.R. § 7.29 and in FSA Handbook 22-PM (Rev. 1), Part 10, Section 4. The findings and analysis that follow constitute

1

my conclusions from review of the Agency File, the exhibits submitted by the parties, the hearing conducted on February 10-11 and March 24, 2014, and the post-hearing closing statements that were timely submitted by the parties.

### FINDINGS OF FACT

1. Puckett was a Grade 7 PT in the Jackson County FSA Office. Tr. 2/10/14 at 16, 36. She had worked for FSA since 1983, approximately 30 years. Tr. 2/10/14 at 15; Tr. 3/24/14 at 816.

2. Josefy has been the County Executive Director for Jackson County, supervising and managing that office, since January of 2012. Tr. 2/10/14 at 21-22, 24.

3. Three other PTs, in addition to Puckett, worked in the County Office and were supervised by Josefy: Patrizia Buchanan ("Buchanan"), Wanda Miller ("Miller"), and Linda Frantz ("Frantz"). Tr. 2/10/14 at 36.

4. On January 30, 2012, Josefy provided the County Office employees with a document setting forth office policies. Agency File, Tab 18 at 12; Tr. 2/11/14 at 611-612. The document, in part, stated:

   > Plan your work accordingly and arrive/leave at the time agreed to. Don't abuse your core work hours. Submit personal leave requests when needed whether the request is for annual or sick leave.

   Agency File, Tab 18 at 12. Puckett was not in the office on January 30th, but Josefy gave her a copy of the document when she returned. Tr. 3/24/14 at 832.

5. Josefy noted that Puckett was always the last employee to arrive. Starting on February 17, 2012, he began noting her late arrivals. Tr. 2/10/14 at 84-85; Agency File, Tab 18 at 10-11.

6. The most recent work schedule on file at that time for Puckett showed that she was on a compressed workschedule from 8:00 a.m. to 5:30 p.m. Puckett testified that she had been on a maxiflex schedule, but there was not a maxiflex work schedule on file. Agency Exhibit 10; Agency File, Tab 18; Tr. 2/10/14 at 63, 65-66, 85; Tr. 3/24/14 at 820, 885-887. PTs Frantz and Miller similarly testified that Puckett had been on a maxiflex schedule. Tr. 2/10/14 at 179; Tr. 2/11/14 at 449.

7. On February 27, 2012, Josefy explained to Puckett that since she was on a compressed schedule she did not get any glide time and could not arrive late. Agency File, Tab 18.

8. Around the beginning of March 2012, Josefy changed all of the PTs' work schedules so that they were on compressed workschedules of 7:00 a.m. to 4:30 p.m., with one shorter workday of 7:00 a.m. to 3:30 p.m. and one non-workday per pay period. Agency

2

Exhibits 9, 10, and 12; Tr. 2/10/14 at 58-63; Tr. 3/24/14 at 820-821. The County Committee approved the schedule changes. Tr. 2/10/14 at 334.

9. Josefy testified that the reason he changed the employees' work schedules was that the office was behind in a lot of areas, the PTs had not been trained in certain areas, and the employees did not have enough time to prepare for appointments and get their work done in the morning. After consultation with the County Committee, Josefy changed the office hours to be from 7:00 a.m. to 4:30 p.m. Tr. 2/10/14 at 43-45; Agency Exhibit 5. Changing the employee work schedules allowed employees to hold staff meetings, train, plan their day, and work without interruption for the hour between 7:00 and 8:00 a.m. Tr. 2/10/14 at 43-45, 53-55. He stated that another reason for changing the work schedules was to ensure the safety and security of the employees. Tr. 2/10/14 at 54.

10. Josefy was unable to provide any specifics as to items that the office was behind on, what areas employees needed to be trained in, or causes for concern for the safety or security of the employees. Tr. 2/10/14 at 223-225.

11. Puckett testified that she was not aware that the office was behind schedule on any of their work in January 2012 nor that there was any backlog in January 2013. She had never heard anyone complain that the office was behind. Tr. 3/24/14 at 873-877.

12. Puckett expressed concern to Josefy about having to arrive earlier under the new schedule and about not being able to leave to pick her daughter up from and drop her off at school. Tr. 2/10/14 at 64-65; Tr. 2/11/14 at 483. Her husband had to change his work schedule so that he could take their daughter to school. Tr. 2/11/14 at 691-692.

13. PT Miller, who had been on a maxiflex schedule, testified that she had concerns about going to a compressed work schedule because of her commute. She spoke with Josefy about her concerns. Tr. 2/11/14 at 443.

14. On March 7, 2012, Josefy held a staff meeting and discussed work schedules with employees of the Jackson County Office. He indicated that all employees would go to a new work schedule of 7:00 a.m. to 4:30 p.m. He told employees that everyone needed to arrive at work on time and that lunch was only 30 minutes in length. He explained that if anyone was going to be late to work or unable to make it to work then they needed to call or text him to let him know the reason. Agency File, Tab 19; Tr. 2/11/14 at 441.

15. At a March 21, 2012, staff meeting, Josefy reminded employees that they needed to let him know if they were going to be late, if they return from lunch late, or if they were leaving the office for any reason. Agency File, Tab 18 at 16. If employees were late, they were to submit a leave request for the period of time that they were not at work. Tr. 2/10/14 at 67.

16. Josefy testified that he took the time early in the morning to have staff meetings and conduct training at least once a week, if not more often. Tr. 2/10/14 at 55.

17. Josefy used the clock on his computer to determine what time employees arrived. Josefy verified with an ITS employee that all computers in the office showed the same time. He also informed employees that he was using his computer to track time. Tr. 2/10/14 at 77-79; Exhibit 11; Agency File, Tab 18 at 16.

18. PT Frantz testified that at some point after Josefy changed the employees' work schedules, approximately 2 or 3 months after Josefy came to the Jackson County Office, District Director Lyndal Stoup advised Josefy to work with the employees and allow them to have glide time and not use leave from 7:00 a.m. until 7:07 a.m. Tr. 2/10/14 at 143.

19. All of the PTs who were in the Jackson County Office at the time testified that there was a "7 minute rule" in place. Tr. 2/10/14 at 144-147; Tr. 2/11/14 at 459-465, 622-623, 636; Tr. 3/24/14 at 821-822, 827-828; Appellant Exhibits 2-3. Miller testified that she remembered Josefy telling them that if they got to work before 7:07 they were "good" and they would not be counted as late; anything past that would be charged leave. Tr. 2/11/14 at 459. Puckett testified similarly. Tr. 3/24/14 at 821-823, 827-828.

20. Josefy denied that there was any such "7 minute rule" and disagreed with the employees' statements to that effect. Tr. 2/10/14 at 226-230, 259. He agreed that the 7 minute rule was a misinterpretation. Tr. 2/10/14 at 361. Josefy further testified that he was fairly certain that the 7 minute number came from a staff meeting that he held explaining what leave would be charged. He had used an example of a person arriving at 7:08, which would be rounded to the nearest 15-minute increment and so leave would be charged. Tr. 2/10/14 at 335-336.

21. PT Frantz testified that Josefy singled out Puckett. She stated that there were times where everyone ran a couple of minutes late. Frantz testified that Josefy never asked her about those instances where she was late, whereas Josefy brought it to Puckett's attention every time Puckett was late or was within the 7 minute rule timeframe. Frantz felt that Josefy was "trying to intimidate or goad" Puckett. Tr. 2/10/14 at 152, 155.

22. PT Buchanan similarly testified that Puckett was singled out for tardiness and that Josefy bullied his employees. Tr. 2/11/14 at 646-647.

23. Josefy distinguished Puckett's tardiness as excessive and repeated as compared to the other office employees. Tr. 2/10/14 at 257.

24. Josefy kept notes of Puckett's arrival times and other employees' arrival times from July 2012 through March 2013. Agency File, Tab 7; Tr. 2/10/14 at 260. Josefy testified that he compiled the notes found in Agency File, Tab 7, which cover the timeframe of December 6, 2012, through March 25, 2013, on March 25, 2013 from his personal notes. Tr. 2/10/14 at 261-262.

25. There were several instances where PT Frantz called or texted after 7:00 a.m. to say that she would be in late or would not be coming in:

- 7/16/2012: 7:15 call that she was sick and would be in late. Agency File, Tab 15 at 3.
- 10/15/2012: 7:01 text that she would be late. Agency File, Tab 12 at 7.
- 12/10/2012: 7:03 text that she was sick. Agency File, Tab 7 at 4.
- 12/26/2012: 7:01 text that she wouldn't be in. Agency File, Tab 7 at 6.
- 1/14/2013: text that she would be on sick leave. Agency File, Tab 7 at 7.
- 1/15/2013: text would be in late. Agency File, Tab 7 at 7.
- 3/14/2013: text at 7:03 that she would be on leave. Agency File, Tab 7 at 10.
- 3/11/2013: text would be in late. Agency File, Tab 7 at 10.
- 3/19/2013: took extra 6 minutes for breaks, as did Puckett-neither disciplined for this. Agency File, Tab 7 at 10.

Frantz was never disciplined for any of these instances. Tr. 2/10/14 at 162-168, 181, 285-291. Frantz testified that she did not usually call or text Josefy if she arrived after 7:00 a.m. but before 7:07 a.m. Tr. 2/10/14 at 162-168, 181. She further testified that she usually arrived 5 to10 minutes before 7:00 a.m. It did not occur even once a pay period that she came in after 7:00 a.m. Tr. 2/10/14 at 180, 182.

26. PT Miller testified that she usually arrived at 7:00, 7:01, or 7:02 a.m. Tr. 2/11/14 at 445. She arrived to the office on three occasions between 7:00 a.m. and 7:07 a.m. without calling ahead of time to say that she would be in after 7:00. There were two documented times that she arrived late, but she had called prior to 7:00 a.m. to provide notice that she would be late:
   - 10/9/12: Miller arrived at 7:04. Agency File, Tab 12 at 7.
   - 10/15/12: Miller arrived at 7:01. Agency File, Tab 12 at 7.
   - 8/1/12: Miller arrived at about 7:02. Agency File, Tab 15, at 7.
   - 1/2/13: Miller called at 6:52 a.m. to say that she would be late. Agency File, Tab 7 at 6.
   - 2/7/13: Miller called at 6:35 to state she would be late. She arrived at 7:14 and requested 15 minutes A/L. Agency File, Tab 7 at 8.

Miller did not receive any disciplinary action or counseling for these instances. Tr. 2/10/14 at 263-266; Tr. 2/11/14 at 446, 458, 475. Miller testified that she would call or text Josefy if she knew she was going to be even 5 minutes late to be safe. Tr. 2/11/14 at 446, 471.

27. PT Buchanan arrived after 7:00 a.m. but before 7:08 on 11 occasions without explanation or having called or texted to say she would be late:
   - 7/17/12: Buchanan arrived at 7:03. Agency File, Tab 15 at 3.
   - 7/20/12: Buchanan arrived at 7:03. Agency File, Tab 15 at 3.
   - 8/1/12: Buchanan arrived at approximately 7:02. Agency File, Tab 15 at 7.
   - 8/2/12: Buchanan arrived at 7:03. Agency File, Tab 15 at 7.
   - 8/3/12: Buchanan arrived at 7:05. Agency File, Tab 15 at 7.
   - 8/6/12: Buchanan arrived at 7:03. Agency File, Tab 15 at 7.
   - 10/15/12: Buchanan arrived at 7:03. Agency File, Tab 12 at 7.

- 10/30/12: Buchanan arrived at 7:03. Agency File, Tab 12 at 11.
- 1/4/13: Buchanan arrived at 7:04 a.m. Agency File, Tab 7 at 6.
- 1/30/13: Buchanan arrived at 7:04 a.m. Agency File, Tab 7 at 7.
- 3/1/13: Buchanan arrived at 7:04 a.m. Agency File, Tab 7 at 9.

Buchanan also texted on November 7, 2012, that she would be in late. Agency File, Tab 12 at 4. Buchanan was not disciplined for arriving late. Tr. 2/10/14 at 267-272; Tr. 2/11/14 at 638. Josefy testified that for those times that Buchanan did not call him in advance he talked with Buchanan about showing up on time, both in staff meetings and meeting with her one-on-one. Tr. 2/10/14 at 114-115, 341-342.

28. Josefy counseled PT Buchanan about her cell phone use, providing her with a supervisory memo. Tr. 2/10/14 at 275-277, 283, 345-346. Buchanan's cell phone use decreased considerably thereafter. Tr. 2/10/14 at 345-346. Buchanan testified that she was on annual leave for one of the days that Josefy had cited in the memo as evidence of her excessive cell phone use. She further stated that it was her understanding that the issue was never going to be brought up again because he had made the numbers and times up. Tr. 2/11/2014 at 639-643.

29. On March 27, 2012, Josefy met with Puckett and discussed his concerns regarding her timeliness in arriving for work. Agency File, Tab 18 at 1. Josefy provided Puckett with a written counseling that she was required to report for work at her designated 7:00 am start time. The counseling memorandum warned Puckett that future tardiness might be recorded as AWOL on her time and attendance record and could result in additional corrective actions. The memorandum also reminded Puckett that breaks are not an entitlement, but acknowledged that breaks are sometimes necessary. Josefy informed Puckett that if an occasional break was necessary, then it had to be on premises and of short duration. Josefy also instructed Puckett that she had to contact him if she was going to be arriving late, requesting leave, or if should could not be at work because of illness. Agency File, Tab 17.

30. During the March 27, 2012, meeting Josefy told Puckett that he was not inclined to approve leave without pay (LWOP) requests. Puckett was upset, shouted, and abruptly went to her workstation, loudly stating that Josefy was "nitpicking" about the time she arrived. Tr. 2/10/14 at 93; Agency File, Tab 18 at 1. Josefy asked her to come back into his office. Josefy's notes from the conversation indicate that Puckett asked if she had the option of being on a compressed or maxi-flex work schedule. Puckett told Josefy that she used to come in at 7:30 or 8:00 a.m. and that there was never a problem. Josefy reminded her that she was on a compressed work schedule. Agency File, Tab 18 at 1-2; Tr. 2/10/14 at 93-94.

31. PT Frantz testified that Puckett is blessed with a strong voice and that what sounds normal to her may sound loud to someone else. Tr. 2/10/14 at 176.

32. At an April 3, 2012, County Committee meeting, Josefy informed the County Committee about the issues regarding Puckett's failure to arrive to work on time. The County

Committee indicated to Josefy that the previous County Executive Director had the same problem with Puckett. Tr. 2/10/14 at 95-96; Agency Exhibit 6.

33. On April 24, 2012, Josefy and Puckett discussed the validation of Puckett's time sheet. Josefy told Puckett that because she was 10 minutes late getting to work the previous Wednesday that she needed to record that lost time. She again complained loudly in front of other employees that Josefy was "picking" on her. Josefy asked her to come into his office to talk about the issue further. Puckett shouted that she did not need to come back into his office and complained loudly about differences between NRCS and FSA employees. Puckett went into Josefy's office, slamming the door behind her. Agency File, Tab 18 at 4-5; Tr. 2/10/14 at 101-102.

34. On July 2, 2012, Josefy gave Puckett a letter of reprimand for discourteous conduct, referencing Puckett's outbursts on March 27 and April 24, 2012, and her failure to follow written instructions in the March 27, 2012, counseling memorandum to arrive at work on time. The letter again referenced Puckett's 7:00 a.m. start time, reminded Puckett that compressed work schedules do not allow for flexible arrival and/or departure times, and told Puckett that she had to take leave for a late arrival or early departure from work. The letter referenced 23 occasions on which Puckett arrived late to work for a total of 166 minutes.
   - March 30—4 minutes
   - April 3—5 minutes
   - April 16 – 6 minutes
   - April 17—3 minutes
   - April 18—9 minutes late
   - April 23—6 minutes late
   - May 3—8 minutes late
   - May 16—7 minutes late
   - May 21—9 minutes late
   - May 22—4 minutes late
   - May 24—5 minutes late
   - May 29—10 minutes late
   - June 4—8 minutes late
   - June 5—10 minutes late
   - June 11—14 minutes late
   - June 13—7 minutes late
   - June 14—8 minutes late
   - June 18—6 minutes late
   - June 19—7 minutes late
   - June 21—5 minutes late
   - June 25—9 minutes late
   - June 26—9 minutes late
   - June 27—7 minutes late

7

The letter warned Puckett that any future violations could result in more severe disciplinary action, up to and including removal. Agency File, Tab 16; Tr. 2/10/14 at 103.

35. According to Josefy's July 2, 2012, notes, he gave Puckett the letter of reprimand and a terse conversation ensued. She complained that he would not let her take care of her family and children. Josefy asked if there was something that prevented her from being on time every morning. Puckett responded, "I don't know. Sometimes, I just can't be here on time. There are several things. I try to get up and make it to work but sometimes I'm just late. . . . I can't help it if I'm sick every morning. I could get a doctor to sign off on the fact that I'm sick every morning. What would you do with that?" Josefy stated, "As long as you have leave and medical documentation to support that, I'll review it to see if it is acceptable." Puckett indicated that she was never late when she was on 8-5:30. "You made us change to 7 to 4:30 and nobody wanted to." Josefy stated that since Puckett was the timekeeper in the office she was "kind of held to a higher standard regarding . . . time and attendance." Puckett was visibly upset and crying. Puckett refused to sign the letter of reprimand and threw the letter across Josefy's desk. Agency File, Tab 15 at 11-12; Tr. 2/10/14 at 104-105.

36. Josefy's notes indicate that Puckett asked when she had to charge leave, whether it was 7:07 a.m. or 7:08 a.m. Josefy responded "It's usually when the time is rounded up to the nearest 15 minute increment, but additional time could be required to be reported if you're late." Agency File, Tab 15 at 12.

37. Josefy testified that the letter of reprimand did not deter Puckett's tardiness. Tr. 2/10/14 at 107.

38. On July 25, 2012, Puckett was absent without approved leave from 7:00 am to 7:15 am for a total of 15 minutes. Agency File, Tab 14; Tr. 2/10/14 at 111.

39. That same day, Josefy called Puckett into his office to discuss the leave issue. During the discussion, Puckett shouted, "This is fucking bullshit! You are a joke and all you're trying to do is pick on me!" When Josefy asked her to calm down and stop shouting, Puckett yelled, "I'm not calming down! I can yell if I want to!" When leaving Josefy's office, Puckett threw the office door open hard enough to bounce off the opposite wall. Puckett then proceeded to her cubicle and began yelling again, accusing Josefy of talking to a producer about her. Josefy again asked Puckett to calm down. Puckett continued to yell that Josefy was "picking on" her and making her "look bad." After Josefy asking Puckett to calm down again, Puckett yelled, "You are a fucking asshole!" Agency File, Tab 14; Agency File Tab 15 at 3-4; Tr. 2/10/14 at 109-110.

40. Josefy testified that other employees were present during Puckett's outburst and approached him about they saw and heard. Josefy instructed the other employees not to get involved and not to talk to anyone about the issue. Tr. 2/10/14 at 110.

41. PT Miller was present in the office on July 25, 2012, and stated that:

> Around 4:27 or 4:28 p.m. [Puckett] came out of [Josefy's] office and was
> extremely upset. She was louder than usual and I am not sure if I would
> say she was yelling (Paula is loud anyway). She did say that Carl was
> picking on her all the time, I think. I truly could not tell you all that was
> said.
>
> [Josefy] tried to get her to lower her voice and come back in so they could
> visit and Paula refused because I think she felt like she needed to say it in
> front of us so she could have witnesses. In defense, I felt like Carl did the
> same when he kept asking her to lower her voice, settle down and come
> back in to visit.

Agency File, Tab 15 at 1.

42. PT Frantz, in a letter dated July 26, 2012, written at Josefy's request that she relate the
July 25, 2012, events, stated that she saw Puckett go into Josefy's office. She then heard
Puckett raise her voice and ask, "Why are you always picking on me." Frantz further
stated:

> I tried to ignore the situation, but when she left his office she was loud and
> outspoken about his picking on her. He asked her to calm down several
> times but she kept raising her voice. He asked her to come back into his
> office and she said no and kept raising her voice about why he kept
> singling her out. He said she needed to go home, but she kept responding
> with anger. His response was stern but in a normal tone of speech. I did
> not hear him raise his voice and sensed he wanted to keep their
> conversation behind closed doors and in private.

Agency File, Tab 15 at 2.

43. On July 26, 2012, Puckett left work for the day at 12:45 pm without obtaining Josefy's
approval prior to her departure for a total of 2.75 hours. Puckett did not have any annual
leave remaining, so it was considered AWOL. Agency File, Tab 14; Tr. 2/10/14 at 111.

44. Josefy testified that he visited with the County Committee about proposing a 5 day
suspension for Puckett. He stated that they responded that the issue needed to be
resolved and had "drug on too long." Tr. 2/10/14 at 113.

45. On July 31, 2012, Puckett was given a notice of proposed disciplinary action of a 5
calendar day suspension from duty without pay. The proposed suspension was based on
two reasons: (1) discourteous conduct in the workplace (based on Puckett's behavior on
July 25, 2012) and (2) AWOL. The specifications related to the AWOL charge were the
15 minutes of AWOL on July 25, 2012 and taking leave without pre-approval on July 26,
2012. Agency File, Tab 14; Tr. 2/10/14 at 107-111.

46. Josefy testified that Puckett was visibly upset by the letter and shouted that she did not understand why this had to happen to her. Josefy testified that she even mentioned a couple of times when he had asked her if she was late and that she had answered yes. Josefy testified that Puckett said she wished he would go back to his previous county office, that nobody liked him, and that he was a joke. Tr. 2/10/14 at 112.

47. Josefy's notes dated July 31, 2012, indicate, however, that Puckett's reaction occurred during a conversation that morning about AWOL and leave. Shortly thereafter, Josefy stopped by PT Linda Frantz's desk to ask a question. Linda Frantz was sitting at her desk holding her stomach. When Josefy asked if she was ok, Frantz replied, "No, I'm not. I'm upset at my stomach about what's going on between you two. I don't understand it and it is affecting me and my health and I just want you all to work it out!" When Josefy said that the matter did not involve her, Frantz replied, "It does involve me when I've worked with someone for 20 to 25 years and they are my friend. I hate to see this bickering all of the time and it needs to stop." Agency File, Tab 15 at 5.

48. Josefy's July 31, 2012, notes state that he and District Director Lyndal Stoup met with Puckett at 4:00 p.m. on July 31, 2012, and that the proposed disciplinary action was discussed with and provided to Puckett at that time. The notes do not reflect any outburst by Puckett at that time. Agency File, Tab 15 at 5-6.

49. Puckett did not submit a written or oral reply to the proposed disciplinary action.

50. On August 15, 2012, a decision letter sustaining the proposed 5-day suspension was provided to Puckett. Puckett was suspended from duty and pay August 17, 2012, through August 23, 2012. The letter warned Puckett that any repetition of the misconduct or other misconduct could result in more severe disciplinary action, up to and including removal. Agency File, Tab 13.

51. On October 24, 2012, Puckett emailed Josefy, carbon copying District Director Stoup, disputing her recorded arrival time on October 18, 2012. She stated that she arrived at 7:07 a.m. as originally recorded on her timesheet and disputed the change to that record which indicated that she had arrived at 7:08 a.m. and charged her 15 minutes of AWOL. She referred to Josefy telling the office that it was ok if they arrived between 7:00 and 7:07 a.m. She also disputed the 15 minutes of AWOL charged for unapproved sick leave, arguing that she had been on approved sick leave for a doctor's appointment that ran 15 minutes later than expected. She asked to meet with someone other than Josefy. Appellant Exhibit 6. Josefy did not remember if he had responded to the email. Tr. 2/10/14 at 317-318. Puckett testified that she never got a response from Josefy or District Director Stoup. Tr. 3/24/14 at 847-851.

52. Puckett's most recent performance appraisal (covering FY 2012 and dated October 31, 2012) rated her fully successful in "Individual Contributions to the Team." The standard for this performance element includes whether the employee "ordinarily displays dependability and reliability." Josefy commented that Puckett "cooperates with coworkers and others in completing assigned work on time and provides information

freely about assigned programs as required. Fosters a productive and cooperative working relationship with others by showing understanding and courtesy and contributes ideas in team meetings." Agency File, Tab 3 at 17; Tr. 3/24/14 at 851-852. The performance review indicated that Puckett completed her work in a timely manner. Agency File, Tab 3. Josefy indicated that he did not address Puckett's timeliness in arriving to work in her performance appraisal as it is a conduct issue, not a performance issue. Tr. 2/10/14 at 359-360.

53. On November 1, 2012, a notice of proposed disciplinary action of a 14-day suspension was provided to Puckett. The reason for the proposed suspension was excessive, repeated tardiness. 20 specifications were listed in the letter:
   - August 28, 2012: You arrived at 7:05 a.m.
   - August 29, 2012: You arrived at 7:06 a.m.
   - August 30, 2012: You arrived at 7:10 a.m.
   - August 31, 2012: You arrived at 7:11 a.m.
   - September 5, 2012: You arrived at 7:08 a.m.
   - September 13, 2013: You arrived at 7:12 a.m.
   - September 14, 2012: You arrived at 7:06 a.m.
   - September 19, 2012: You arrived at 7:10 a.m.
   - September 20, 2012: You arrived at 7:10 a.m.
   - September 24, 2012: You arrived at 7:07 a.m.
   - September 26, 2012: You arrived at 7:08 a.m.
   - September 27, 2012: You arrived at 7:07 a.m.
   - October 3, 2012: You arrived at 7:06 a.m.
   - October 9, 2012: You arrived at 7:07 a.m.
   - October 10, 2012: You arrived at 7:13 a.m.
   - October 11, 2012: You arrived at 7:06 a.m.
   - October 12, 2012: You arrived at 7:22 a.m.
   - October 16, 2012: You arrived at 7:07 a.m.
   - October 17, 2012: You arrived at 7:07 a.m.
   - October 18, 2012: You arrived at 7:08 a.m.

Agency File, Tab 11; Tr. 2/10/14 at 116-117.

54. Josefy testified that when he presented the November 1, 2012, letter to Puckett she was again upset and had another outburst in front of the employees. Tr. 2/10/14 at 117.

55. On November 7, 2012, Puckett and her husband Jim met with then County Committee chair David Bush about the 14-day proposed suspension. Agency File, Tab 10; Tr. 2/11/14 at 678-680. Notes from that meeting state:

> Paula stated that she never had a problem with Rod when he was here and everything was fine. David said that was not exactly right because he and the [County Committee] were aware of her tardiness. David stated that Rod (former CED in Jackson County FSA) discussed this issue many

> times with the [County Committee] and that he had also talked to Paula
> about the issue on several occasions and that she would be on time for a
> while after being talked to and then would go back to being tardy.

Agency File, Tab 10.

56. According to the November 7, 2012, meeting notes, Puckett's husband Jim stated
"that sometimes he had to hurry her out of the house to get to work. He stated
that she might be at the sink washing dishes about 10 minutes before 7:00 and he
had to tell her 'You need to stop doing that and get to work. It's almost time for
you to be there.'" Agency File, Tab 10. Jim Puckett testified at the DAFO
hearing that this was false and that he never made this statement. Tr. 2/11/14 at
722.

57. Jim Puckett testified that when he and Puckett met with David Bush that Puckett
explained the 7 minute rule in the office and that she also explained glide time. Jim
Puckett further testified that David Bush assured them that if he were the deciding official
on the case that he would not approve the suspension because he did not think Puckett
needed it. Tr. 2/11/14 at 679-680.

58. On November 15, 2012, the County Committee met to discuss the proposed 14 day
suspension of Puckett. The County Committee sustained the reason and listed
specifications for the proposed 14-day suspension of Puckett. The County Committee
suspended Puckett from duty and pay from November 18, 2012, through December 1,
2012. David Bush certified that he had taken the Douglas Factors into consideration in
this decision. Agency File, Tab 8; Agency Exhibit 7.

59. The County Committee Advisor asked Puckett if she had been late. According to the
signed County Committee minutes, Puckett replied, "Yes. But he's making a big deal out
of two minutes, or three minutes, or five minutes. He . . . won't let me use flex time to
help me out a little!" Agency Exhibit 7.

60. Puckett indicated to the County Committee that there was no reason she could not arrive
at work on time. Agency File, Tab 8 at 2.

61. Josefy testified that Puckett's late arrivals did not stop after the 14-day suspension. Tr.
2/10/14 at 119-120.

62. By letter dated March 29, 2013, Josefy gave notice to Puckett of her proposed removal.
The reason for the proposed removal was excessive, repeated tardiness. The following
22 specifications were listed:
    1. December 6, 2012: You were 8 minutes late returning from lunch.
    2. December 13, 2012: You arrived at 7:05 a.m.
    3. December 21, 2012: You arrived at 7:05 a.m.
    4. January 4, 2013: You arrived at 7:07 a.m.
    5. January 14, 2013: You arrived at 7:06 a.m.
    6. January 31, 2013: You arrived at 7:05 a.m.

7. February 5, 2013: You arrived at 7:05 a.m.
8. February 7, 2013: You were 30 minutes late returning from lunch.
9. February 13, 2013: You arrived at 7:05 a.m.
10. February 14, 2013: You arrived at 7:05 a.m.
11. February 15, 2013: You arrived at 7:06 a.m.
12. February 19, 2013: You arrived at 7:07 a.m.
13. February 21, 2013: You arrived at 7:10 a.m.
14. February 25, 2013: You arrived at 7:07 a.m.
15. March 1, 2013: You arrived at 7:09 a.m.
16. March 4, 2013: You arrived at 7:05 a.m.
17. March 6, 2013: You arrived at 7:05 a.m.
18. March 11, 2013: You arrived at 7:05 a.m.
19. March 13, 2013: You arrived at 7:07 a.m.
20. March 14, 2013: You arrived at 7:05 a.m.
21. March 19, 2013: You arrived at 7:08 a.m.
22. March 21, 2013: You arrived at 7:07 a.m.

Agency File, Tab 6; Tr. 2/10/14 at 121-122; Tr. 3/24/14 at 882.

Out of these 22 specifications, 17 were cases where Puckett arrived at 7:07 a.m. or earlier. See Tr. 2/10/14 at 231.

63. Josefy's notes also indicate that Puckett arrived 4 minutes late on December 30, 2012. December 30, 2012, was a Sunday. Josefy testified that the date was in error. Agency File, Tab 7 at 1; Tr. 2/10/14 at 301-303; Tr. 3/24/14 at 845-846. This instance was not included as a specification. Agency File, Tab 6.

64. Puckett knew that she was coming in after 7:00 a.m., but she testified that she thought she was abiding by the 7 minute rule. Tr. 3/24/14 at 904.

65. With respect to her arrival times on all of the instances specified in the proposed removal, with the exception of February 21, 2013, Puckett had validated her time of arrival on her time and attendance reports as 7:00 a.m. Josefy had certified each of these reports as correct. He did not charge leave or AWOL for any of these instances. Tr. 2/10/14 at 254; Appellant Exhibit 4. He agreed that under handbook procedure employees should be putting down their arrival times to the minute. Tr. 2/10/14 at 385. He testified that he could have rejected Puckett's time sheets and made her correct them to indicate another arrival time. Tr. 2/10/14 at 315, 386. Puckett thought that she was on time every day because Josefy accepted all of her timesheets as true and correct. Tr. 3/24/14 at 867-868.

66. On several other occasions between December 18, 2012, and March 28, 2013, Puckett arrived after 7:00 a.m. or came back late from lunch, but advised Josefy via text message that she would be late. Only one of these occasions—February 7, 2013, when she came back late from lunch—was listed in the 22 specifications. Appellant Exhibit 9; Tr. 2/10/14 at 351-359. When Puckett texted Josefy to say that she would be returning late from lunch on February 7, 2013, he responded, "Okay." He did not indicate that she was

in violation of any rule or otherwise address the instance with Puckett until the proposed removal letter. Tr. 2/10/14 at 374-377.

67. Josefy did not talk to Puckett at any point during the 4 month period from December 2012 through the end of March 2013 about her arrival times. Tr. 2/10/14 at 309-310, 312; Tr. 3/24/14 at 854-855.

68. District Director Stoup and Josefy presented the proposed removal letter to Puckett. Josefy testified that she was visibly upset, crying, and did not understand why it had to happen. Josefy further testified that Puckett did not cite any reasons why she could not get to work on time. Tr. 2/10/14 at 122-123.

69. Josefy testified that there was nothing else he could have done to try to resolve the situation. Tr. 2/10/14 at 315-316. He testified that removal was the "last and best option," given Puckett's excessive repeated tardiness, use and recording of AWOL, the numerous counselings, the staff meetings explaining the need to arrive on time, the supervisory memo, and the two suspensions. Tr. 2/10/14 at 365-366.

70. Josefy considered trying out a different work schedule, but did not do so because of the amount of work the County Office had left to do—payments, AGI forms, 2013 acreage reports, sign up, and MIDAS training. Tr. 2/10/14 at 379. Josefy had indicated in notes from an April 12, 2013, meeting that once the County Office had caught up on work they would be allowed to work a maxiflex work schedule. Josefy confirmed in his testimony that the notes were accurate, but that at this point in 2013 he still did not feel a maxiflex work schedule could work. Tr. 2/10/14 at 379-380; Agency File, Tab 5 at 3.

71. When asked if he had considered keeping compressed work schedule, but with a start time of 8:00 a.m. instead of 7:00 a.m., Josefy testified that he did consider this, but that he determined a 7:00 to 4:30 p.m. workschedule was the norm and would work best. Tr. 2/10/14 at 381-382.

72. On April 12, 2013, Puckett and her representative, Mr. Daniel Gamino, met with the County Committee to appeal Puckett's proposed removal. Josefy was not present during their presentation of Puckett's case. Agency File, Tab 5; Agency Exhibit 8.

73. At the appeal, Gamino denied that Puckett was late on the dates and times listed in the letter and questioned how Josefy determined Puckett's late arrival times. Agency Exhibit 8. Gamino noted that the total time at issue where Puckett was late was just over two hours. He further noted that Puckett had stated and always been willing to stay a few minutes later in the day to make up for any amount of time that she was late in getting to work. He noted that the maxi flex work schedule allowed for glide time, but that Puckett was not given an opportunity by Josefy to use that schedule. Gamino argued that the County Committee should consider whether to offer that schedule. Agency Exhibit 8.

74. After Gamino and Puckett were excused from the committee room, the County Committee asked how many chances Puckett had been given to correct the tardiness.

District Director Stoup referenced the previous disciplinary actions and counselings. He also stated that he had met with Puckett on two occasions individually and had pleaded with her to be on time, noting that it could eventually cause her to be removed. Agency Exhibit 8.

75. The County Committee called Josefy into the meeting to answer questions. Josefy explained to the County Committee that he arrived to work early each day and wrote down the times that employees came in late from his computer screen. Josefy stated that the time was noted as soon as the employee came in the door. Josefy further told the County Committee that Puckett certified her time and attendance as accurate during those pay periods in which she denied coming in late. Agency File, Tab 4; Agency Exhibit 8.

76. The County Committee then reviewed the *Douglas* Factors. The County Committee noted that whether the tardiness was intentional or not, it has certainly been frequent and has been documented since July 2012 (Factor 1). The County Committee noted Puckett's disciplinary history (Factor 3) and that Puckett's earlier offenses (Factor 6). Based on her leave records and Josefy's previous statements that he never knew if Puckett would be at work on a particular day, the County Committee determined that Puckett was not a dependable employee (Factor 4). The County Committee found that Puckett was on clear notice of the rules she violated, as those rules were identified in the July, August and November 2012 letters (Factor 9). The Committee determined that employee rehabilitation would be highly unlikely given the derogatory remarks she had made to Josefy and the Committee and her lack of respect for Josefy (Factor 10). The County Committee considered the challenges that Puckett faced outside of work, but determined that they were not different than those faced by most people (Factor 11). The Committee also discussed alternative sanctions. Agency Exhibit 8.

77. County Committee Chair Cary Pat Wallace ("Wallace") testified that the County Committee reviewed the *Douglas* Factors on each of Puckett's previous suspensions as well. Tr. 2/11/14 at 522-524. Wallace testified that Puckett's position was important to the office (Factor 2) and that he believed all of the *Douglas* Factors applied in some way. Tr. 2/11/14 at 526-527. He did not feel that there were mitigating circumstances where the County Committee could have decided not to suspend Puckett. *Id.* at 527-528.

78. Wallace testified that the County Committee was never told about a 7 minute rule by Josefy, but that Puckett had mentioned it during one of their meetings. Tr. 2/11/14 at 543-544. Wallace testified that he was never told that there was a uniform practice in the office among all PTs that if they were there by 7:07 they were ok. When asked whether it would make a difference to him if there was a rule or a practice in the office that if somebody came in at 7:07 a.m. or earlier that they were ok, Wallace responded that it would. *Id.* at 548-549, 562-563.

79. Wallace testified that there was no discussion with the County Committee on whether other employees had been tardy when considering Douglas Factor 6. Tr. 2/11/14 at 555.

80. Wallace did not recall ever seeing or reviewing a "Table of Penalties," but the Committee did get advice from Jeremy Lundergan, a Human Resources Specialist in Kansas City. Tr. 2/11/14 at 556-558.

81. Wallace testified that Puckett gave some explanation for being tardy—that she talked about getting her daughter back and forth from school. He did not characterize this as a frivolous issue, but said that it is something everyone has to deal with and is not unusual. Puckett also mentioned her husband's heart condition and that he had been taken to the Emergency Room on several occasions. Tr. 2/11/14 at 564-566. Wallace also recalled Puckett mentioning that she suffered from migraines. Tr. 2/11/14 at 566-567.

82. Wallace further testified that neither Puckett's migraines, nor her husband's heart condition, provided reasonable justification for her not being able to arrive at 7:00 a.m. but still being able to arrive by 7:05 a.m. Puckett did not provide any specific information as to how her husband's heart condition caused her to be able to arrive at 7:05 a.m., but not at 7:00 a.m. Tr. 2/11/14 at 587. Wallace testified that Puckett did not present any evidence at the reply hearing that showed a direct conflict with her ability to make it to work by 7:00 a.m. Tr. 2/11/2014 at 594.

83. When asked if the Agency suffered because of Puckett's tardiness, Wallace responded "[m]aybe not directly" but later added that it was disruptive with other employees. Tr. 2/11/14 at 591.

84. When asked if the County Committee was told that after Puckett's 14-day suspension there were still other employees coming in after 7:00 a.m. that were not disciplined, Wallace responded no. Tr. 2/11/14 at 596.

85. Wallace testified that the County Committee had discussed one alternative option of a "sudden death" rule, where Puckett would be given 90 days and if she were late one time then she would be removed. Tr. 2/11/14 at 575-576. Changing the workschedule was also discussed, but Josefy wanted everyone on the same schedule. Wallace agreed that this was just an arbitrary decision by Josefy. Tr. 2/11/14 at 577-578.

86. Wallace testified that the 7:00 a.m. to 4:30 p.m. compressed work schedule made sense to him, but did not give any examples of improved productivity as a result of the schedule. Tr. 2/11/14 at 582.

87. The County Committee unanimously determined that Puckett should be removed from office. Agency Exhibit 8.

88. By way of a letter hand-dated May 1, 2013, Puckett was informed that the County Committee had decided to remove her from office, based on repeated, excessive tardiness and the 22 sustained specifications. Agency File, Tab 4. Wallace signed the letter, but did not write it. Tr. 2/11/14 at 536-538. It is unclear when Puckett received this letter. The Agency File indicates that Puckett received the letter on April 29, 2013, but Puckett

AR 0159

testified that she received it on May 1st when she was called into Josefy's office and it was given to her. Agency File, Tab 3 at 1; Tr. 3/24/14 at 883-885.

89. On May 1, 2013, Puckett submitted a written appeal to the State Committee. Agency File, Tab 3.

90. On May 20, 2013, Puckett met with the State Committee for an oral reply. Agency File, Tab 2.

91. Miller wrote a letter to the State Committee on behalf of Puckett asking that they reconsider their decision to remove Puckett and urging them to consider other options. Miller testified that Puckett was a great asset to the office. Appellant Exhibit 3; Tr. 2/11/14 at 490-493.

92. Buchanan also wrote a letter to the State Committee ask that the reconsider their removal decision. Buchanan stated that Puckett was a "valuable asset" and that the "entire situation got out of control and was mishandled." Appellant Exhibit 2; Tr. 2/11/14 at 624. Buchanan testified that Puckett did a good job and would always help the other employees. Tr. 2/11/14 at 629. Buchanan testified that Puckett was not more than a few minutes late and that since the office was not open until 8:00 it was not hurting a thing. Buchanan testified that when Puckett arrived to work it was her practice to go directly to her desk and start to work. Others could still be getting coffee at that time. Tr. 2/11/14 at 628. Buchanan further testified that Josefy should have told Puckett that she was late when signing Puckett's timesheet. Tr. 2/11/14 at 625. Buchanan testified that Josefy had returned timesheets to employees before to be corrected. Tr. 2/11/14 at 626.

93. Some Jackson County producers submitted a petition on Puckett's behalf, asking that she be reinstated to her position. Appellant Exhibit 3, at 28-30; Tr. 2/11/14 at 686-687. Cary Pat Wallace testified that he had not been made aware of the petition—that the first time he had seen it was at the DAFO hearing. Tr. 2/11/14 at 532-33.

94. By way of a June 3, 2013, letter, the State Committee upheld the decision to remove Puckett from duty. Agency File, Tab 1. The State Committee determined that the County Committee had appropriately weighed the *Douglas* Factors in reaching its decision.

95. Puckett timely appealed her removal to DAFO.

96. Puckett and her husband, Jim Puckett, testified at the DAFO hearing about Jim's heart condition, Puckett's migraines, the health problems of Puckett's mother, and the fact that they have a teenage daughter. While Jim Puckett said these things *could* impact Puckett's ability to get to work on time, he gave no specific examples. He could not remember if Puckett experienced any migraines in the period from December 2012 to March 2013. Tr. 2/11/14 at 692-698. On cross-examination, he admitted that Puckett did not have to assist him because of his heart condition on any of the dates listed in the removal letter. Tr. 2/11/14 at 713. He could not say whether Puckett had to assist their

daughter on any of those dates. *Id.* Similarly, Puckett did not explain how these issues caused her to arrive at work after 7:00 a.m or provide any specific instances or documentation to show a causal connection. Tr. 3/24/14 at 857-861, 905-910.

97. At the DAFO hearing, Puckett asked to be reinstated to her position, that she be granted backpay and benefits, that her attorney fees be covered, and that her personnel file be purged of the removal proceedings.

ANALYSIS

An agency must establish three things when it takes an adverse action against an employee. First, it must prove by a preponderance of the evidence that the charged conduct occurred. Second, the agency must establish a nexus between the conduct and the efficiency of the service. Third, it must demonstrate that the penalty imposed was reasonable. *Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280, 306-307 (1981).

**The Agency proved the charge against Puckett by preponderant evidence.**

The burden is on the government to prove the case that the charges against Puckett—the specifications for her removal—are true by a preponderance of the evidence. Preponderance of the evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as sufficient to find that a contested fact is more likely true than not.

The charge against Puckett was excessive, repeated tardiness. In support, the Agency provided evidence of 20 instances when Puckett arrived after her designated start time of 7:00 a.m. and 2 additional instances in which Puckett was late returning from lunch. These 22 instances constituted the specifications for Puckett's removal. Finding of Fact 62.

Agency Handbook 17-PM, Leave Administration and Alternative Work Schedules, provides that employees on a compressed work schedule (CWS) have fixed, not flexible, arrival and departure times each workday. Handbook 17-PM, subparagraph 34A. Employees must use minute-to-minute time accounting to record their daily arrival and departure times. Handbook 17-PM, subparagraph 33D. The handbook further provides:

> An occasional or unavoidable absence or tardiness of less than 1 hour may be excused by the employee's immediate supervisor without charge to leave.

Employees who are habitually tardy may be:

- charged leave in 15-minute increments
- asked to change their AWS to better suit their arrival times
- charged AWOL.

**Note:** A supervisor, dealing with a habitually late employee, should seek advice from the employee relations staff in their SPO before charging AWOL.

Handbook 17-PM, subparagraph 7E. AWOL is a discretionary tool that supervisors may use for attendance-related disciplinary purposes such as tardiness. Handbook 17-PM, subparagraph 113.

Josefy placed all of the employees in the Jackson County Office on a compressed work schedule with a fixed start time of 7:00 a.m. Finding of Fact 14. Puckett knew that she was coming in after 7:00 a.m. Finding of Fact 64. She provided no evidence to contradict the 20 specifications relating to her arrival after 7:00 a.m.—Specifications 2-7 and 9-22. Nor did Puckett dispute that she was 8 minutes late returning from lunch on December 6, 2012 (Specification 1).

For each of the specified instances where Puckett arrived after 7:00 a.m, with the exception of February 21, 2013, when she arrived at 7:10 a.m. (Specification 13), Puckett entered her arrival time as 7:00 a.m. on her time and attendance. Josefy did not reject her time sheet for correction to charge leave, nor did he charge AWOL for these instances. Finding of Fact 65.

While Josefy had discretion to excuse occasional tardiness of less than 1 hour, he was not required to do so. Puckett arrived after 7:00 a.m. on more than just an occasional basis between December 2012 and March 2013. The fact that Josefy did not reject Puckett's timesheets for correction—charging her with leave or AWOL at the time—is certainly relevant when considering the clarity of notice that Puckett received and her potential for rehabilitation, but does not alter the fact that she arrived after her designated, fixed start time of 7:00 a.m. on 20 occasions and returned to the office late from lunch on December 6, 2012. Specifications 1-7 and 9-22 are thus sustained.

With regard to Specification 8, however, Puckett provided advanced notice to Josefy that she would be late returning from lunch on February 7, 2013. Puckett submitted the leave request when needed per Josefy's written instructions. Josefy responded "Okay" and in no way indicated that she needed to return to the office or that she was in violation of any rule. See Findings of Fact 4 and 66. The Agency has not shown that a violation occurred on February 7, 2013, and thus has not proved Specification 8.

In *Oates v. Dept. of Labor*, 2007 MSPB 46, ¶ 9, the Merit Systems Protection Board stated:

> Where more than one event or factual specification supports a single charge, proof of one or more, but not all, of the supporting specifications is sufficient to sustain the charge. *Burroughs v. Department of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990). An agency is required to prove only the essence of its charge; it need not prove each factual specification supporting the charge. *Hicks v. Dept. of the Treasury*, 62 M.S.P.R. 71, 74 (1994), *aff'd*, 48 F.3d 1235 (Fed. Cir. 1995).

While the Agency has not proved Specification 8, it has proved 21 other specifications of Puckett's tardiness in a 4 month period. The frequency with which Puckett arrived after 7:00 a.m. certainly constitutes repeated tardiness.

The question is whether Puckett's tardiness should also be considered excessive. In other contexts, organizations have defined excessive tardiness in terms of the number of times an employee is late to work. *See, e.g., Whitlock v. Ark. Blue Cross & Blue Shield*, 2009 U.S. Dist.

LEXIS 94649 (E.D. Ark. Oct. 9, 2009) ("excessive tardiness" defined as "being late to work and coming back late from breaks, or lunch, more than six times in any three month period").

In *Bryant v. National Science Foundation*, 105 F.3d 1414, 1417-1418 (Fed. Cir. 1997), the United States Court of Appeals, Federal Circuit, upheld a charged offense of excessive tardiness that was based on 23 instances of being tardy, resulting in a total of 22 ¼ hours of AWOL, in a 4 month period. The Court noted that the agency had tolerated the employee's absences for some time before taking more stringent measures. The Court further noted that the employee had failed to report to work on time regularly despite the agency's oral and written counselings, a suspension, and several schedule changes. *Id.*

Similarly, the Agency has demonstrated 21 instances where Puckett was tardy. In 17 out of these 21 specifications, Puckett arrived at 7:07 a.m. or earlier. Puckett has argued that there was a "7 minute rule" in effect in the office, where employees could arrive on or before 7:07 a.m. and still be counted as being on time. All of the other program technicians in the office similarly believed that this 7 minute rule was in place. Finding of Fact 19. Puckett thus contends that she should not have been counted as late in any of these 17 instances.

However, Puckett had received various written warnings that she needed to arrive to work at 7:00 a.m. On March 27, 2012, she received a written counseling that she was required to report for work at her designated start time of 7:00 a.m. Finding of Fact 29. On July 2, 2012, she received a letter of reprimand, again reminded her of her 7:00 a.m. start time and instructing her to report to work on time. This letter specified 23 instances of Puckett's tardiness, including 13 in which she arrived between 3 and 7 minutes late. Finding of Fact 34. On November 1, 2012, Puckett received a notice of a proposed 14-day suspension, listing 20 specifications of instances in which she arrived after 7:00 a.m., including 10 specified instances in which she arrived between 7:00 and 7:07 a.m. The letter again reminded Puckett of her fixed start time of 7:00 a.m. Finding of Fact 53. The reasons for the proposed suspension were sustained by the County Committee and Puckett was suspended for 14 days. Finding of Fact 58.

Given the multiple times that Puckett was told in writing that she needed to be at work at 7:00 a.m. and that she was previously disciplined for arriving between 7:00 and 7:07 a.m., she should have known that she needed to arrive at 7:00 a.m. *See Zwagil v. General Services Administration*, 103 M.S.P.R. 63 (2006) (when an employee has a past disciplinary record involving behavior similar to the current offense, the employee has been put on notice that such behavior will not be tolerated by the agency).

Taken all together, Puckett was tardy 2.2 hours between December 2012 and March 2013. Despite the short periods of tardiness involved in each of the individual specifications, she still failed to follow written warnings and report to work on time. In this case, as in *Bryant*, the long-standing pattern and frequency of Puckett's tardiness supports a charge of excessive, repeated tardiness. The Agency has proved the charge by a preponderance of the evidence.

AR 0163

**The Agency has shown a nexus between the sustained charge and the efficiency of the service.**

An adverse action may be taken only if it is necessary to promote the efficiency of the service. There must be a nexus or causal connection between the charged offense and the efficiency of the service. *Mings v. Dept. of Justice*, 813 F.2d 384 (Fed. Cir. 1987).

Puckett argues that there is no evidence that her tardiness impacted the efficiency of the service. However, an agency is "entitled to have an employee present during scheduled hours" and unauthorized absences constitute cause for discipline. *Law v. United States Postal Service*, 852 F.2d 1278, 1279-1280 (Fed. Cir. 1989). Nexus between the offense and the efficiency of the service is automatic when the charge is absence without leave, including excessive tardiness. *Davis v. Veterans Administration*, 792 F.2d 1111, 1113 (Fed. Cir. 1986) (absence without leave for several days); *Bryant v. National Science Foundation*, 105 F.3d 1414, 1417-1418 (Fed. Cir. 1997) (repeated tardiness).

As the Court explained in *Bryant*,

> An essential element of employment is to be on the job when one is expected to be there. To permit employees to remain away from work without leave would seriously impede the function of an agency. An unexcused absence imposes burdens on other employees and, if tolerated, destroys the morale of those who meet their obligations…The extent of the penalty for the offense is the only open question.

105 F.3d at 1417-1418.

**Puckett has not met her burden of establishing claimed affirmative defenses by a preponderance of the evidence.**

An appellant bears the burden of demonstrating affirmative defenses by a preponderance of the evidence. Puckett appears to claim affirmative defenses of discrimination, harassment and undue pressure, proposing findings of fact with respect to each of these defenses in her closing statement.

First, Puckett claims that she was subject to disparate treatment because other employees received the benefit of the 7 minute rule and were not disciplined when they arrived between 7:00 and 7:07 a.m. Puckett fails to make a case that the other employees were similarly situated and that she was discriminated against for some unlawful reason. None of the other employees were tardy without advance notice as frequently as Puckett was, nor did they have the prior disciplinary record that she did. The Agency has articulated a nondiscriminatory reason for its action—the charged misconduct. Appellant has not provided any evidence to show that this was not the actual reason for her removal. *See Adams v. Dept. of Labor*, 2009 MSPB 185 (2009).

Second, Puckett claims that she was subject to harassment. Puckett states that she was treated differently from other employees and that Josefy played favorites in the office. She points to Josefy's statement that he could see when she left her house (Tr. 2/10/14 at 299) and that he

21

AR 0164

noted that she had arrived late to work on December 30, 2012, a Sunday. She also noted that Josefy never responded to her October 24, 2012, email asking to talk with someone else, never criticized her performance, and never counseled her in the 4 month period from December 2012 to March 2013. Appellant's Closing Argument and Proposed Findings of Fact and Conclusions of Law, 18-31. Puckett has failed to set forth a clear basis upon which it can be determined that she suffered harassment in the workplace. Such a generalized allegation of harassment, offered without sufficient supporting evidence or any supporting argument, need not be considered. *See Reid v. U.S. Postal Service*, 67 M.S.P.R. 105, 108 n.4 (1995).

Finally, Puckett claims that she was undue pressure. In support, she points to her husband's heart problems, her mother's health problems, her migraines, and the fact that she had a teenage daughter. Undue pressure, in the context of affirmative defenses, does not relate to pressures outside of the work environment. In reviewing an affirmative defense of undue pressure, MSPB has looked to see whether there is evidence that undue pressure was placed on an employee to take a certain action, such as pressure placed on a deciding official to come to a certain conclusion or decision. *See, e.g., Buelna v. Dept. of Homeland Security*, 2014 MSPB 45 (2014); *Seeler v. Dept. of the Interior*, 2012 MSPB 36 (2012). No such evidence of undue pressure has been provided in this case. At best, the issues that Puckett cites could be mitigating factors when assessing whether the penalty of removal is appropriate. (See discussion below.)

In sum, Puckett has not met her burden of demonstrating any of her claimed affirmative defenses by a preponderance of the evidence.

**The imposed penalty of removal is not within the bounds of reasonableness.**

Having determined that the Agency proved the charge against Puckett of excessive, repeated tardiness and that this conduct has the required nexus with efficiency of the service, it must be determined whether the penalty of removal was a proper penalty in this case. Any penalty chosen must be proper and not be arbitrary, capricious, or beyond the bounds of reasonableness. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306 (1981).

In deciding on a penalty, an agency must consider the relevant *Douglas* factors, which include:

1. The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical and inadvertent, or was committed maliciously or for gain, or was frequently repeated;
2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;
3. The employee's past disciplinary record;
4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;
5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;
6. Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

22

7. Consistency of the penalty with any applicable agency table of penalties;
8. The notoriety of the offense or its impact upon the reputation of the agency;
9. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;
10. Potential for the employee's rehabilitation;
11. Mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harrassment, or bad faith, malice or provocation on the part of others involved in the matter; and
12. The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

The factors listed in *Douglas* are not exhaustive, and the agency is only required to consider those that are relevant. *Bryant v. Nat'l Sci. Found.*, 105 F.3d 1414, 1418 (Fed. Cir. 1997).

In balancing the *Douglas* factors, primary importance is placed on the nature and seriousness of an offense, and its relationship to an employee's duties, position and responsibilities. *Gartner v. Dept. of the Army*, 104 M.S.P.R. 463 (2007). Puckett had been a program technician for almost 30 years. Finding of Fact 1. While the frequency of Puckett's tardiness is not a matter to take lightly, she was tardy for a mere 2.2 hours in a 4 month period. This cannot be said to be an offense so serious in nature as to justify removal, particularly as no evidence was presented by the Agency that her tardiness was impacting her ability to get her work done. In fact, her most recent performance appraisal was positive, noting several times that she completed her work in a timely manner and that she had a productive and cooperative working relationship with others in the office. Finding of Fact 52. Her coworkers and producers in the area encouraged the State Committee to reconsider their decision to remove Puckett from duty. Findings of Fact 91-93. Performance records and years of service can be significant mitigating factors. *Jackson and White v. Dept. of the Army*, 99 M.S.P.R. 604 (2005). Douglas Factors 2, 4, and 5 thus all weigh in Puckett's favor.

The Agency table of penalties, found in the Employee and Labor Relations Guide Book, indicates that the appropriate penalty for a subsequent offense of unexcused tardiness can range from a 5-day suspension to removal. As Puckett had been previously disciplined for unexcused tardiness and unauthorized absence, the penalty of removal is consistent with the applicable Agency table of penalties. (Factor 7). While the frequency of Puckett's tardiness was greater than that of other program technicians in the Jackson County Office, Puckett presented evidence that program technician Pat Buchanan had not received even a verbal counseling for arriving to work after 7:00 a.m. on 10 instances between December 2012 and March 2013. Douglas Factor 6 thus tends to weigh slightly in Puckett's favor.

The State Committee appropriately weighed Puckett's previous disciplinary record—including a letter of reprimand and 2 suspensions for unauthorized absence and unexcused tardiness—against her. (Factor 3). These disciplinary actions and the warnings contained within them also provide warning to Puckett about her tardiness. Josefy's failure to reject Puckett's timesheets to indicate that she did not arrive at 7:00 a.m., to charge her with leave or AWOL, or to discuss her tardiness with her during the 4 month period from December 2012 to March 2013 does muddy the waters somewhat in terms of the clarity with which Puckett was put on notice of the rules.

23

Findings of Fact 65 and 67. Not having done so, it is difficult to say whether Puckett would have continued to arrive after 7:00 a.m.

Finally, unlike the supervisor in *Bryant v. National Science Foundation*, Josefy did not try out a different work schedule to see if it would have an impact on Puckett's ability to arrive on time. Puckett had expressed concern about her work schedule. Josefy did not present any compelling business reasons why either Puckett could not be placed on a work schedule with a later arrival time or be placed on a maxiflex work schedule that would give her some "glide" time. While Josefy testified that the office was behind in its work, Puckett testified that this was not the case. Even assuming that the office was behind in some areas, no evidence was presented that the office has made any progress in getting caught up now that the employees are under a compressed workschedule. Had Josefy tried another work schedule and Puckett continued her pattern of tardiness, then it could fairly be said that the potential for her rehabilitation is low. Absent trying a different work schedule, her potential for rehabilitation is more difficult to judge. (Factor 10).

As noted above, Puckett raised several issues for consideration as mitigating factors—her health, her husband's health, her mother's health, and the fact that she has a teenage daughter. An alleged medical condition will be entitled to considerable weight as a mitigating factor only where it played a part in the charged conduct. *Sherlock v. General Services Administration*, 103 MSPR 352 (2006). Puckett provided no evidence that the cited medical conditions resulted in her tardiness. Findings of Fact 81-82, 96. Nor does the fact that she has a teenage daughter explain her tardiness. Finding of Fact 96. When asked if there was a reason that she could not arrive to work by 7:00 a.m. she could not provide an explanation. Findings of Fact 60 and 68.

Given that other work schedule options were not offered to Puckett, given the nature and seriousness of the offense, and balancing the other relevant *Douglas* factors discussed above, removal is an unreasonable penalty in this case. When an agency's penalty is beyond reasonableness, it should be mitigated only to the extent to bring it within the parameters of reasonableness; a maximum reasonable penalty standard is then applied. Consideration is given to an agency's failure to sustain all of its supporting specifications. *Payne v. U.S. Postal Service*, 72 M.S.P.R. 646, 650-651. In this case, I find that a maximum appropriate penalty would be a 30 day suspension from duty and pay.

**Conclusion and Recommendation**
I conclude that the Agency has met its burden of showing Puckett's excessive, repeated tardiness by a preponderance of the evidence. There is an automatic nexus between excessive tardiness and efficiency of the service. However, after balancing the *Douglas* Factors, I find that the penalty of removal is unreasonable in this case. Accordingly, I recommend that DAFO reverse the removal action and impose in its place a 30 day suspension without pay.

Dated this 17th day of July, 2014


Amy Webbink
Hearing Officer

24